UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-228-TBR

JAE ENTERPRISES, INC.,                                              Plaintiff,

v.

OXGORD INC., et al.,                                              Defendants.


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the Motion for a Preliminary Injunction of Plaintiff Jae Enterprises, Inc. (Docket No. 5.) Defendants Oxgord, Inc. and Day to Day Imports, Inc. have responded, (Docket No. 7.), and Plaintiff has replied. (Docket No. 18.) Fully briefed, this matter is ripe for adjudication. For the reasons enumerated below, the Court will DENY Plaintiff's Motion.

## Background

Plaintiff Jae Enterprises, Inc ("Jae") provides aftermarket automobile accessories. (Docket No. 5-1 at 2.) Jae both manufactures and distributes "a variety of automobile and truck accessories, such as wheel simulators, wheel covers, spoilers, fender trim and wheel trim." *Id.* Defendants OxGord, Inc. and Day to Day Imports, Inc. ("Defendants") manufacture and distribute auto parts and accessories as well as various other products. (Docket No. 7 at 3.)

Jae's automobile and truck accessories are "sold under a federal trademark registration for the mark Eagle Flight, Reg. No. 4037849." (Docket No. 5-1 at 2.) According to Jae, it distributes its Eagle Flight goods by either selling them to its customers directly or by selling them to wholesale distributors who then sell the goods to consumers. (Docket No. 5-1 at 3.) When Jae sells directly to its customers, the internet is its "main forum," and it sells to customers through its own website as well as through internet retailers like Amazon. *Id.*

1

On April 18, 2013, Jae and the Defendants entered into a distribution contract whereby Defendants purchased Eagle Flight products from Jae and then re-sold the products to end customers in a manner of their choosing. (Docket Nos. 5-1 at 3; 7 at 3.)  The Defendants re-sold the products through internet retailers such as Amazon. (Docket No. 7 at 3.) According to the Defendants, they "currently offer over 47,000 products through their Amazon seller account, and fulfill thousands of orders daily at their warehouse facilities in Los Angeles." *Id.*

The Defendants explain that when an online customer "searches for an Eagle Flight product on Amazon, he or she is directed to a single product detail page for the product."[1] *Id.* The product detail page provides the customer the option of purchasing the product from multiple sellers. *Id.* at 3-4. Here, when a customer searched for an Eagle Flight product, he or she had the option of purchasing the product from Jae, the Defendants, or other authorized distributors. (Docket No. 5-1 at 3.) The Defendants sold Eagle Flight products on Amazon under their Amazon seller account entitled "Car Accessories." (Docket Nos. 5-1 at 3; 7 at 4.) The parties' distribution contract permitted the competition between Jae, the Defendants, and the other authorized distributors on Amazon as it "did not contain any territory or sales channel restrictions." (Docket No. 5-1 at 3.)

Eventually, the parties' relationship deteriorated. On October 3, 2013, one of Jae's employees informed the Defendants that effective October 15, 2013, Jae was terminating its business relationship with them. (Docket Nos. 5- 1 at 4; 7 at 4.) Even after their business relationship ended, both parties agree that the Defendants were lawfully permitted to sell any remaining Eagle Flight products that they had purchased under the distribution contract. (Docket Nos. 5-1 at 4; 7 at 4.) The Defendants contend that "[a]s of October 15, 2013, [they] still had

---

[1] Jae appears to agree with this characterization of the search process on Amazon although Jae refers to the webpages as "product listings." (Docket No. 5-1 at 3.)

Eagle Flight products stored in their warehouse in Los Angeles." (Docket No. 7 at 4.) The Defendants state that they continued to market and sell the remaining Eagle Flight products on Amazon and by other means. *Id.*

According to Jae, it became concerned when over two years after the parties terminated their relationship, the Defendants were still selling products under the Eagle Flight mark on Amazon. (Docket No. 5-1 at 4.) Jae believes that "Defendants were purposefully advertising and selling non-Eagle Flight products under the Eagle Flight name." *Id.* To confirm its suspicions, Jae through the help of others placed orders for Eagle Flight products advertised and sold by Defendants on Amazon. *Id.* Jae alleges that after it ordered the Eagle Flight products from the Defendants, it received "generic products or even competitors' products" instead of genuine Eagle Flight merchandise. *Id.* Jae also alleges that Defendants "purposefully delayed shipments" of the Eagle Flight products and "responded to customer complaints that the delay was caused by 'quality issues' with the manufacturer," i.e. Jae. *Id.* at 4-5. The Defendants counter that they did not use the Eagle Flight mark to intentionally advertise and sell non-Eagle Flight products. (Docket No. 7 at 5.) They contend that if in fact customers placed orders for Eagle Flight products from them on Amazon and received non-Eagle Flight products, this could only have occurred as a result of accidental order fulfillment errors due to their "high-volume distribution operation." *Id.*

In addition to allegedly advertising and selling non-Eagle Flight products as genuine Eagle Flight products, Jae contends that the Defendants "gained administrative access to Jae's Eagle Flight fender flare listings on Amazon and altered the listing to state incorrect information including that a particular product only fits a certain style of truck, that a listing is only for a single product as opposed to an entire set, and changed the model years with which a particular

product is compatible." (Docket No. 5-1 at 5.) Upon finding the changes in its product detail page on Amazon, Jae contacted Amazon. *Id.* According to Jae, Amazon "confirmed that the changes had been made by a registered seller with the brand name 'OxGord.'" *Id.* Jae contends that the Defendants never purchased this particular product during the parties' distribution relationship. *Id.* As a result of the Defendants' alleged alteration, "Jae informed Amazon that Defendants were no longer authorized Eagle Flight distributors and requested that Amazon disconnect Defendants from all Eagle Flight listings." *Id.* In response to Jae's allegations regarding the changes to its product detail page, the Defendants argue that in April 2015 as part of their normal procedures for maintaining their Amazon product listings, they "uploaded a large amount of data to Amazon to update their tens of thousands of product listings." (Docket No. 7 at 5.) The Defendants contend that if they changed any information on Jae's product detail page such change was an inadvertent result of their large data upload. *Id.* Furthermore, Defendants allege that the product detail page at issue "was not an Eagle Flight-branded product detail page, but rather a generic product detail page created by [Jae] under the seller name 'AutoRestylers.'" (Docket No. 7 at 6.)  Lastly, the Defendants argue Amazon has "remediated this issue" as it has disconnected the Defendants from all Eagle Flight listings. *Id.*

Jae also alleges that the Defendants called customers who had purchased Eagle Flight products and provided positive feedback reviews on Amazon. (Docket No. 5-1 at 5.) Jae states that customers were offered a refund for the Eagle Flight product they purchased in exchange for changing their review from positive to negative on Amazon. (Docket No. 5-1 at 6.) Jae contends that it has an audio recording of one of the alleged calls and believes that it "originated with Defendants." *Id.* Since learning of the alleged phone calls, Jae states that it has identified multiple positive reviews of Eagle Flight products that were recently changed to negative

4

reviews. *Id.* Jae believes that the Defendants previous relationship to its Eagle Flight product listings allowed them to access customer information. *Id.* Jae reasons that the new negative reviews do not hurt the Defendants as they have been removed from all Eagle Flight product listings on Amazon, but it does directly harm Jae and the Eagle Flight brand. *Id.* The Defendants deny this allegation.  (Docket No. 7 at 6.) The Defendants state that they contract with third parties to provide customer service representatives and that those customer service representatives routinely conduct "follow-up phone-calls" with the Defendants' customers from Amazon. *Id.* With regards to the recorded phone call Jae provided to the Defendants, the Defendants state that a customer service representative offered one of the Defendants' customers an incentive to reevaluate his or her previous review on Amazon. *Id.* Defendants allege that the customer service representative did not mention an Eagle Flight product and "merely ask[ed] the customer to write a review on Amazon reflecting the customer's honest opinion of the product." *Id.*  The Defendants further allege that it appears that the customer service representative and the caller were discussing a generic product and not an Eagle Flight product. *Id.* According to the Defendants, the customer service representative and the caller were discussing fender flares and the Defendants do not believe that Jae sells fender flares under the Eagle Flight mark. *Id.*

## Legal Standard

When considering whether or not to issue a preliminary injunction, the court must consider and balance the following four factors:

> 1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citing *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)). "These four considerations are factors to be balanced, not prerequisites that must be met." *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 958 (S.D. Ohio 2005) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985)). The issuance of a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "It is because preliminary injunctive relief is such a 'drastic' remedy that plaintiffs must show circumstances clearly demand its entry." *Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The movant must "carr[y] his or her burden of proving that circumstances clearly demand" the issuance of a preliminary injunction. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)).

**Discussion**

The Plaintiff Jae requests that this Court issue a preliminary injunction prohibiting Defendants  from (1) using its Eagle Flight mark in connection with the advertising and sale of aftermarket automobile accessories; (2) from altering its online product listings to include incorrect information about Eagle Flight products; and (3) from offering incentives to Eagle Flight customers to change their prior positive feedback reviews.

As previously stated, this Court must consider and balance four factors when determining whether or not to issue a preliminary injunction. The Court will consider each of these four factors below.

I.    Likelihood of Success on the Merits

The first factor the Court must consider before issuing an injunction is whether the movant has a strong likelihood of success on the merits.

Jae contends that the Defendants infringed on its Eagle Flight trademark in violation of the Lanham Act. (Docket No. 5-1 at 8.) The crux of Jae's success on the merits regarding its trademark infringement claim comes down to whether or not the Defendants were authorized to use the Eagle Flight mark and whether or not the Defendants had the Eagle Flight products they advertised in their inventory or if they were purposefully advertising Eagle Flight products that they did not have in their inventory and, consequently, sending customers non-Eagle Flight products. The Court has extensively considered the likelihood of Jae's success on the merits below and concludes that at this time, it is not clear that the Jae would win its trademark infringement claim on the merits as the facts alleged are greatly in dispute.

The Lanham Act protects registered patents, trademarks, and copyrights. *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013). With regard to trademark infringement, the Lanham Act states the following:

(1)  Any person who shall, without the consent of the registrant-

(a)  use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

shall be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1)(a). In order to prove trademark infringement, a party must show "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among

7

consumers regarding the origin of the goods offered by the parties.'" *Goodfellow*, 717 F.3d at 502 (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)). There is an exception known as the "first sale" exception which provides a defense to a claim of trademark infringement. The Court will discuss the three elements of a trademark infringement claim and the exception in detail below.

### A.    Ownership of the Trademark

In this case, the first element concerning Jae's ownership of the Eagle Flight trademark is undisputed. (See Docket Nos. 5-1; 7; 18.) The Defendants do not contest the validity of Jae's trademark, and the Court finds that Jae's trademark is valid and protectable.

### B.    Unauthorized Use of the Mark in Commerce

With respect to the second element, the parties disagree as to whether or not the Defendants had authorization to use the Eagle Flight mark[2] and whether or not the Defendants "used" the Eagle Flight mark in commerce as defined under the Lanham Act. (Docket Nos. 5-1 at 4-5; 7 at 8-13; 18 at 3-5.)

A trademark is deemed to be "used in commerce" when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and the goods are sold or transported in commerce." 15 U.S.C. § 1127; *see also Rohn v. Viacom Int'l, Inc.*, No. 1:14-CV-83, 2015 WL 4395280, at *3 (W.D. Mich. July 15, 2015). Goods sold through the internet fall under the jurisdiction of the Lanham Act as the internet is "an instrumentality of interstate commerce." *Ford Motor Co. v.*

---

[2] The Court will address this issue in its discussion of the Defendants' asserted defense of the "first sale" exception. *See infra* Part I.D.

*Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 622 (E.D. Tenn. 2012) (quoting *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045 (10th Cir. 2008)).

The Defendants argue that the alleged conduct does not constitute a "use in commerce" of Jae's Eagle Flight mark. (Docket No. 7 at 12.) The Defendants contend that because Jae created the Eagle Flight product detail pages on Amazon through which the Defendants allegedly sold the products at issue, they did not in fact "use" the Eagle Flight mark in commerce. *Id.* In response, Jae argues that "Defendants have undeniably used the Eagle Flight mark in commerce through their Amazon advertisements." (Docket No. 18 at 4.) Jae then cites to 15 U.S.C. § 1127 describing the term "use in commerce" in relation to services. *Id.* Jae cites to the wrong portion of § 1127's definition of "use in commerce" as this action concerns goods and not services. However, the Defendants alleged actions would meet the requirement of the definition of "use in commerce" concerning goods.

Under 15 U.S.C. § 1127, a trademark is used in commerce when "it is placed in any manner on . . . the displays associated [with the goods]." The Patent and Trademark Office ("PTO") publishes the Trademark Manual of Examining Procedure ("TMEP") which provides trademark attorneys and trademark applicants "with a reference work on the current law, practices, and procedures relative to prosecution of applications to register marks" with the United States PTO. *Guides, Manuals, and Resources*, U.S. PAT. & TRADEMARK OFF. (Jan. 1, 2016, 12:18 AM), http://www.uspto.gov/trademark/guides-and-manuals/manuals-guides-official-gazette. Though this manual concerns applications for trademarks, the PTO's TMEP provides a helpful analysis of 15 U.S.C. § 1127's definition of "use in commerce" pertaining to goods. According to the TMEP, "[d]isplays associated with the goods also exist in an electronic or online environment in the form of web pages. These 'electronic displays' perform the same

function as traditional displays." Patent and Trademark Office, U.S. Dep't of Commerce, Trademark Manual of Examining Procedure ("TMEP") § 904.03(g) (Oct. 2015). The TMEP states that "[a] webpage that displays a product can constitute 'a display associated with goods' if it: (1) contains a picture or textual description of the identified goods; (2) shows the mark in association with the goods; and (3) provides a means for ordering the identified goods." TMEP § 904.03(i). Notably, "[a] webpage from a third-party website (such as Amazon) may be acceptable as a display if the mark is sufficiently associated with the applicant's goods." *Id.*

In this action, given the parties' description of the Eagle Flight product detail pages on Amazon and the Court's knowledge of Amazon, it appears that the Defendants' alleged sale of Eagle Flight products on Amazon through Eagle Flight product detail pages would satisfy the TMEP's three factors. (*See* Docket Nos. 5-1 at 3-4; 7 at 3-4.)  The Defendants do appear to have "used" the Eagle Flight mark in commerce.

### C.    Likelihood of Confusion Among Consumers

The third element regarding confusion is often "[t]he touchstone of liability under § 1114." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). In making a determination concerning whether a likelihood of confusion exists, a Court must weigh the following eight factors:

> 1. strength of the senior mark;
> 2. relatedness of the goods or services;
> 3. similarity of the marks;
> 4. evidence of actual confusion;
> 5. marketing channels used;
> 6. likely degree of purchaser care;
> 7. the intent of defendant in selecting the mark; and
> 8. likelihood of expansion of the product lines

*Id.* (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). However, "these factors imply no mathematical precision, and a plaintiff need not show that all,

or even most, of the factors listed are present in any particular case to be successful." *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 959 (S.D. Ohio 2005) (citing *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249–50 (6th Cir. 2003)). For a court, "the ultimate question is whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* (quoting *Daddy's Junky Music Stores*, 109 F.3d at 280).

This Court considered and weighed the aforementioned eight factors below. After its analysis of the eight factors, the Court finds that they do suggest a likelihood of confusion because consumers would be likely to believe the non-Eagle Flight products allegedly sold by the Defendants as Eagle Flight products were affiliated with Jae's Eagle Flight brand.

1. Strength of the Mark

The first factor is the strength of the mark. The Plaintiff Jae "owns a federal trademark registration for Eagle Flight for use in conjunction with aftermarket automobile sales." (Docket No. 5-1 at 10.) Jae argues that "Eagle Flight" is an arbitrary mark and therefore is "deserving of the highest protection." *Id.* According to the Sixth Circuit Court of Appeals, "[w]hen assessing its strength, a court will place a trademark into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary." *Daddy's Junky Music Stores*, 109 F.3d at 280. "Fanciful or arbitrary marks are the strongest and most distinctive." *Id.* In particular, "an arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached such as CAMEL cigarettes or APPLE computers." *Id.* This Court agrees with Jae that its Eagle Flight mark is arbitrary because "although [it] consist[s] of words with recognized meaning in everyday speech, [it does] not have any inherent connection with the sale" of aftermarket automobile accessories. *Id.* at 281.

2.   Relatedness of the Goods

The second factor is the relatedness of the goods. The Sixth Circuit has stated that "if the parties compete directly by offering their goods . . . confusion is likely if the marks are sufficiently similar." *Id.* at 282 (citing *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir. 1996)). Additionally, "goods "are 'related' not because they coexist in the same broad industry, but are 'related' if the [goods] are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 282-83 (citing *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991)). The Defendants' allegedly advertised and sold non-Eagle Flight aftermarket automobile accessories under the Eagle Flight Mark. (Docket No. 5-1 at 10.) Jae advertises and sells aftermarket automobile accessories under its Eagle Flight mark. *Id.* Both parties are in direct competition as they sell aftermarket automobile accessories through the same product detail pages on Amazon to consumers, and those consumers would certainly be "likely to believe that the [goods], similarly marked, come from the same source." *Daddy's Junky Music Stores*, 109 F.3d at 283. This factor weighs in favor of confusion.

3.   Similarity of the Marks

The third factor is the similarity of the marks. The "[s]imilarity of marks is a factor of considerable weight." *Id.* When a court analyzes the similarity of the marks at issue, they "should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* (citing *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988)). Here, Jae's Eagle Flight mark and the mark under which the Defendants allegedly sold non-Eagle Flight products are identical. Again, the parties utilize the exact same product detail page on Amazon to advertise and sell

products under the Eagle Flight mark. (*See* Docket Nos. 5-1 at 3; 7 at 3-4.) The marks are identical and therefore they would produce a likelihood of confusion among customers.

### 4.   Evidence of Actual Confusion

The fourth factor is evidence of actual confusion.   Though "[e]vidence of actual confusion is undoubtedly the best evidence of [the] likelihood of confusion," the difficulty of obtaining it means that "a lack of such evidence is rarely significant." *Daddy's Junky Music Stores,* 109 F.3d at 284. On the issue of actual confusion, Jae argues that "the recorded communications between the Defendants and Eagle Flight customers establishes that marketplace confusion is indeed occurring." (Docket No. 5-1 at 13.) The Court is unsure of exactly which recorded communications Jae is referring to in this comment as it could be either the Defendants' alleged email correspondences with customers or their alleged phone calls asking customers to change their positive reviews on Amazon. Regardless of which form of alleged communication Jae is referring to, the Court finds that there is little evidence of actual confusion at this time.

### 5.   Marketing Channels Used by the Parties

The fifth factor is the marketing channels used by the parties. "Courts consider the respective marketing channels of the parties to a trademark infringement action to determine how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 519 (6th Cir. 2007) (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)) (internal quotation marks omitted). When the parties sell their goods through different channels, "[t]here is less likelihood of confusion." *Id.* (citation omitted). Here, the parties utilize the exact same marketing channel to sell goods to their customers. Jae uses its Eagle Flight product detail pages on Amazon to sell

aftermarket automobile accessories to its customers, and Defendants allegedly used the very same product detail pages to sell non-Eagle Flight products to customers. (Docket No. 5-1 at 11.) Jae notes that "[a] potential customer who searches on Amazon for aftermarket automobile accessories will likely see both [its] and Defendants' listings for whatever product they searched for." *Id.* This factor suggests a strong likelihood of customer confusion and thus weighs in favor of Jae.

### 6.   Likely Degree of Purchaser Care

The sixth factor is the likely degree of purchaser care. "In assessing the degree of purchaser care, courts typically use a typical buyer exercising ordinary caution standard." *Leelanau Wine Cellars*, 502 F.3d at 519 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 285) (internal quotation marks omitted). Therefore, "[w]hen potential buyers possess special expertise or are sophisticated purchasers of the goods at issue, a higher standard is appropriate, and the likelihood of confusion decreases. Similarly, purchasers of more expensive products are more likely to exercise care, thus reducing the possibility of confusion." *Id.* (citing *Daddy's Junky Music Stores*, 109 F.3d at 285). Here, the Court agrees with Jae that automobile accessories are generally not expensive and do not require special expertise on the part of the purchaser who is buying them from an online retailer. (*See* Docket No. 5-1 at 11.) The likely degree of purchaser care is low. This factor also weighs in favor of confusion. The mark the Defendants' allegedly used to advertise and sell the non-Eagle Flight automobile accessories is identical to Jae's Eagle Flight mark making it likely that with a low degree of care customers would be confused.

### 7.   Intent of Defendants

The seventh factor is the intent of the defendant in selecting the mark.  A Defendant's intent is important because "purposeful copying indicates that the alleged infringer ... believes

that his copying may divert some business from the senior user." *Leelanau Wine Cellars*, 502 F.3d at 520 (citing *Daddy's Junky Music Stores*, 109 F.3d at 286). "Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Daddy's Junky Music Stores*, 109 F.3d at 286 (citing *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 603 (6th Cir. 1991)). Here, Jae argues that "Defendants purposefully copied the Eagle Flight mark and willfully intended to trade on the reputation of the mark." (Docket No. 5-1 at 12.) Jae further contends that the "Defendants are using the mark to pass off non-Eagle Flight products as Eagle Flight products in order to divert customers away from Jae." *Id.* As evidence of the Defendants' malicious intent, Jae cites to the Defendants' alleged phone calls to customers offering them incentives to change their positive reviews to negative reviews on Amazon, and their alleged changes to Jae's Eagle Flight product detail pages on Amazon. *Id.*

However, the Defendants provide a very different account. According to the Defendants, they did not use the Eagle Flight mark to intentionally sell non-Eagle Flight product. Rather, the Defendants argue that four customers who placed orders for Eagle Flight products from the Defendants on Amazon received non-Eagle Flight products as a result of accidental order fulfillment errors that resulted from their "high-volume distribution operation." (Docket No. 7 at 14.) The Defendants contend that they still had Eagle Flight products from their earlier business relationship with Jae and that they were lawfully marketing and selling those products. *Id.* at 8-9. With regards to the alleged phone calls, the Defendants acknowledge that they contract with other companies to provide customer service representatives. *Id.* at 6. Defendants argue that in the phone call at issue the customer service representative appears to be discussing a product with a customer that to Defendants' knowledge Jae does not sell. *Id.* Lastly, concerning the

alleged changes to Jae's Eagle Flight product pages on Amazon, Defendants state that "the allegedly altered page . . . was not an Eagle Flight-branded product detail page, but rather a generic product page created by Jae" and, therefore, could not have created confusion related to the Eagle Flight mark. *Id.* at 16. Given the great disparity between the parties' accounts of the facts at issue, the Court finds that it is unclear if the Defendants intended to copy the Eagle Flight mark. This factor does not weigh in favor of confusion.

### 8.   Likelihood that Product Lines will Expand

The eighth factor is the likelihood of expansion of the product lines.   "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores*, 109 F.3d at 287 (quoting *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1112 (6th Cir. 1991)). This factor is not relevant in this case as the parties are already in direct competition selling aftermarket automobile accessories on Amazon. According to the Sixth Circuit Court of Appeals, "[a] finding that the parties will not expand their markets significantly . . . 'does not address' the ultimate issue of likelihood of confusion . . . [and therefore] is not a strong indication" that there is little or no confusion. *Id.* This factor neither favors nor disfavors the presence of a likelihood of confusion.

### D.   The "First Sale" Exception

In their Reply to Jae's Motion for a Preliminary Injunction, the Defendants argue that their alleged sale of Jae's Eagle Flight products falls under the "first sale" exception and, therefore, Jae "has no chance of succeeding on its trademark infringement claim." (Docket No. 7 at 8.)

The Sixth Circuit Court of Appeals recognizes the "first sale" exception in trademark law which provides a defense to claims of trademark infringement. *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007) (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368–69 (1924)). Under this exception, "resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition." *Id.* In other words, "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Tumblebus*, 399 F.3d at 766 (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995) This Circuit's Court of Appeals has explained that the rationale for the "first sale" exception "is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *Id.* (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987)).

There are two situations under which the resale of a product does not fall within the "first sale" exception. The first is "when the notice that the item has been repackaged is inadequate." *Id.* (citing *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085–86 (9th Cir.1998)). This situation is not at issue in this case. The second is "when an alleged infringer sells trademarked goods that are *materially different* than those sold by the trademark owner." *Id.* at 370 (emphasis in original) (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001)). The underlying rationale for this exception to the "first sale" rule is "that a material difference in a product is likely to cause consumer confusion and could dilute the value of the trademark." *Id.* In order for a difference to be material, it "must be one that consumers consider relevant to a decision about whether to purchase a product." *Id.* (quoting *Davidoff*, 263 F.3d at

1302) (internal quotation marks omitted). "The question of materiality is a fact-based inquiry requiring an examination of the products and markets at issue." *Id.*

As this Court has previously stated, the parties in this case have vastly different accounts of the facts at issue and do not at all agree on the events that allegedly occurred. (*See* Docket Nos. 5; 7; 18.) Both parties have provided affidavits to support their respective accounts of the facts at issue. (*See* Docket Nos. 5-2 at 1-7; 7-1 at 2-7.) The Defendants contend that they did not use the Eagle Flight mark to intentionally sell non-Eagle Flight products. (Docket No. 7 at 5.) Rather, the Defendants argue that while four customers placed orders for Eagle Flight products from the Defendants on Amazon and allegedly received non-Eagle Flight products, this could only have occurred as a result of accidental order fulfillment errors due to their "high-volume distribution operation." *Id.* The Defendants also argue that the incorrect items do not "bear" Jae's trademark and "are easily identified from their outward appearance as other manufacturers' products." (Docket No. 7 at 5.) According to the Defendant's version of the events that transpired, they were only selling the Eagle Flight products left over in their inventory and were not in any way purposefully incorrectly filling customers' orders with non-Eagle Flight products. Under the Defendants' factual version, the "first sale" exception would apply. However, Jae provides a much different factual scenario. According to Jae's version of events, the Defendants were deliberately advertising and selling non-Eagle Flight products under the Eagle Flight name for the express purpose of diverting business from Jae. (Docket No. 5-1 at 4.) Under this version of events, the Defendants would likely be found to have sold trademarked goods that were "materially different than those sold by the trademark owner." *Brilliance Audio*, 474 F.3d at 370.

Due to the factual disputes, the Court is unable to say at this time whether or not Jae's trademark infringement claim would likely succeed on the merits. While Jae would likely satisfy

the first, second, and third elements of a trademark infringement claim, it is unclear whether or not the "first sale" exception would apply and result in a finding for the Defendants. It is certainly possible given the disparity in the parties' factual accounts that a factfinder could believe the Defendants' version of the facts, and the Defendants could successfully assert the "first sale" exception as a defense. Therefore, at this time the Court cannot say that it is likely that Jae's trademark infringement claim will succeed on the merits.

### E.   Jae's Other Claims

The parties disagree as to whether or not Jae's requests for the Court to issue a preliminary injunction to stop the Defendants from (1) altering its online product listings to include incorrect information about Eagle Flight products and (2) from offering incentives to Eagle Flight customers to change their prior positive feedback reviews are relevant to Jae's trademark claim. (*See* Docket Nos. 7 at 14-17;18 at 2.) The Defendants argue that these two requests are not relevant to Jae' trademark infringement claim and would likely fall under another cause of action. (Docket No. 7 at 14-17.) In response, Jae contends it "is entitled to enjoin Defendants' conduct under multiple sections of the Lanham Act and the common law" not just under its trademark infringement claim. (Docket No. 18 at 2.)  The Court agrees with the Defendants that these two requests are not relevant to Jae's trademark infringement claim; however, they are relevant to several other claims asserted by Jae in its Complaint. (*See* Docket No. 1.) Consequently, the Court will address these two requests individually below.

### 1.   Request to Stop Defendants from Altering Online Product Listings

Jae requests that this Court issue a preliminary injunction to prevent Defendants from altering its online product listings to state incorrect information. The Court recognizes that this request could fall under a number of Jae's claims including its False Designation of Origin claim

under 15 U.S.C. § 1125 and its common law claims for Defamation and Tortious Interference with Prospective Business Advantage. (Docket No. 1 at 10-11, 15-17.) However, the Defendants argue that this request is moot because "Amazon has already ensured that Defendants' product listings no longer impact [Jae's] product detail pages." (Docket No. 7 at 19.) In its Motion seeking a Preliminary Injunction, Jae states that after it noticed suspicious and incorrect changes to its product detail pages, it contacted Amazon and learned that the changes were made by a registered seller known as "OxGord." (Docket No. 5-1 at 5.) Jae then states that it "informed Amazon that Defendants were no longer authorized Eagle Flight distributors and requested that Amazon disconnect Defendants from all Eagle Flight listings." *Id.* Following its discussion of the Defendants changes to its product listings, Jae then goes on to articulate the other ways in which the Defendants continued to try to harm Jae "[a]fter being removed from the Amazon listings." *Id.* It appears from Jae's and the Defendants' account of the events that the Defendants are barred from making any future changes to Jae's product listings on Amazon.

It is true that a request for a preliminary injunction may become moot as the litigation progresses. *Nat'l Coal. for Students with Disabilities v. Taft*, No. 2:00-CV-1300, 2002 WL 31409443, at *6 (S.D. Ohio Aug. 2, 2002). According to the Supreme Court, a case "is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). While a Defendant may voluntarily cease to engage in the allegedly illegal conduct at issue, that fact alone does not automatically render an action moot. *Nat'l Coal. for Students with Disabilities*, 2002 WL 31409443, at *6 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)). "In order for the mootness doctrine to apply the Defendant must demonstrate that there is no reasonable expectation that the wrong will be repeated." *Id.* (quoting *W.T. Grant Co.*, 345 U.S. at 633)

(internal quotation marks omitted). The Defendant bears the burden to show that "there is no reasonable expectation that the wrong will be repeated," and it is a "heavy" burden. *Id.* It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)) (internal quotation marks omitted).

Here, according to both parties, Amazon has removed the Defendants' ability to change Jae's product listing pages regardless of whether Defendants' initial actions were intentional or unintentional. Therefore, it is indeed clear that the Defendants allegedly wrongful actions of changing information on Jae's product listing pages "could not reasonably be expected to recur." *Id.* This Court finds that Jae's request for this Court to issue a preliminary injunction to stop the Defendants from altering its online product detail pages is moot.

2.  Request to Stop Defendants from Offering Incentives to Eagle Flight Customers to Change Positive Reviews

Jae also asks this Court to issue a preliminary injunction to prevent the Defendants from offering incentives to Eagle Flight customers to change their positive product reviews to negative reviews. Though Jae does not identify or analyze which of its claims this request concerns, this Court recognizes that this request could fall under a number of Jae's claims including its False Designation of Origin claim under 15 U.S.C. § 1125 and its common law claims for Defamation and Tortious Interference with Prospective Business Advantage. (Docket No. 1 at 10-11, 15-17.) Regardless of which of its claims this request is based upon, the Court does not find that Jae has met its burden to prove that the imposition of an injunction regarding this request is required. There is a significant factual dispute among the parties about the phone calls in question.

Jae alleges that the Defendants called customers who had purchased Eagle Flight products and offered them a refund for the Eagle Flight product they purchased in exchange for

changing their review from positive to negative on Amazon. (Docket No. 5-1 at 5-6.) Jae contends that it has an audio recording of one of the alleged calls, and "*believes that it originated with Defendants.*" *Id.* (emphasis added). Jae argues that the Defendants' previous relationship to Eagle Flight's product listings allowed them to access customer information. *Id.* Jae alleges that the Defendants are calling customers who purchased Eagle Flight products in a direct attempt to harm the Eagle Flight brand and Jae's reputation as its manufacturer. Alternatively, the Defendants state that they contract with third parties to provide customer service representatives and those customer service representatives routinely conduct "follow-up phone-calls" with the Defendants' customers from Amazon. (Docket No. 7 at 6.)  According to the Defendants, Jae provided them with a recording of one of the alleged phone calls. *Id.* The Defendants state that they have not verified that the customer service representative on the call was calling on their behalf. *Id.* The Defendants allege that the customer service representative in the recording offered one of the Defendants' customers an incentive to reevaluate his or her previous review on Amazon. *Id.* However, Defendants allege that the customer service representative did not mention an Eagle Flight product and "merely ask[ed] the customer to write a review on Amazon reflecting the customer's honest opinion of the product." *Id.* The Defendants further allege that it appears that the customer service representative and the caller were discussing a generic product and not an Eagle Flight product. *Id.*

Jae cannot at this time verify that the person on the recorded call is calling on behalf of the Defendants. Rather, Jae states that it "believes" that the recorded call is associated with the Defendants. Moreover, according to the Defendants, the recorded call does not mention or pertain to an Eagle Flight product. This is not sufficient factual proof to warrant this Court's

issuance of the "extraordinary remedy" of a preliminary injunction as a movant cannot show a likelihood of success on the merits without showing factual entitlement to relief.

## II.     Irreparable Injury Without the Injunction

The second factor concerns whether or not the movant will suffer irreparable injury if the Court does not issue an injunction. Jae urges the Court that it will suffer irreparable injury without a preliminary injunction. Jae argues that the "Defendants' use of the Eagle Flight mark in association with their non-Eagle Flight automobile accessories will likely cause confusion, and result in a substantial loss of goodwill among Jae's customers and potential customers." (Docket No. 5-1 at 15.)

Ordinarily, when a Plaintiff seeks an injunction, he "must show that unless injunctive relief is granted, [he] will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Eat BBQ LLC v. Walters*, No. CIV. 12-71-GFVT, 2012 WL 5835679, at *5 (E.D. Ky. Nov. 16, 2012) (quoting *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006)) (internal quotation marks omitted). However, the Sixth Circuit does not require a particular finding of the likelihood of irreparable harm to support injunctive relief in trademark infringement cases when there is a likelihood of success on the merits. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006). This Circuit's Court of Appeals reasons that "irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears from infringement or unfair competition." *Id.* (quoting *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999)).

Here, Jae has not shown a likelihood of success on the merits. The significant factual disputes between the parties make it likely that either party could succeed. Therefore, there is not a presumption of irreparable harm. *IP, LLC v. Interstate Vape, Inc.*, No. 1:14CV-00133-JHM,

2014 WL 5791353, at *8 (W.D. Ky. Nov. 6, 2014) ("[Where plaintiff] does not succeed on the merits ... irreparable harm does not necessarily follow") (citing *Ignition Athletic Performance Group, LLC v. Hantz Soccer U.S.A.*, *LLC*, 245 Fed. Appx. 456, 460 (6th Cir. 2007))). Furthermore, Jae has not shown that it will suffer actual and imminent harm rather than speculative or unsubstantiated harm because it has not provided proof that makes its version of the events more likely than the Defendants. This factor weighs against granting a preliminary injunction.

### III.    Substantial Harm to Others

The third factor concerns whether the issuance of an injunction would cause substantial harm to others. This factor is often "examined in terms of the balance of hardship between the parties." *Interstate Vape*, 2014 WL 5791353, at *8. In other words, the focus under this factor is "whether the defendant will suffer harm if the court grants injunctive relief, and whether the harm plaintiff will suffer is more or less than the harm to the defendant." *Eat BBQ*, 2012 WL 5835679, at *5 (citing *Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695 (6th Cir. 1977)).

Here, the Defendants will suffer little harm if the Court were to issue an injunction. The Defendants contend that they have already "voluntarily ceased selling Eagle Flight products" and, therefore, they would not lose any potential profits. (Docket No. 7 at 18). Additionally, the Defendants can no longer access and change Jae's product listings so enjoining them from such conduct would have no additional effect. *Id.* at 19. Lastly, enjoining the Defendants from contacting customers and offering incentives in exchange for altering their positive reviews to negative ones would not harm the Defendants as they claim that they have never done this. *Id.* However, if the facts are as related by Jae, not issuing an injunction would cause Jae great harm

to its reputation and a substantial loss of goodwill between Jae and its customers. (Docket No. 5-1 at 15-16.) This factor weighs in favor of granting a preliminary injunction.

### IV.   Public Interest

The fourth and final factor concerns whether the public interest would be served by the issuance of an injunction. "Trademark infringement, by its very nature, adversely affects the public interest in the free flow of truthful commercial information." *Eat BBQ*, 2012 WL 5835679, at *6 (quoting *Big Boy Restaurants v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 873 (E.D. Mich. 2002). This factor neither weighs for or against granting an injunction as Jae did not successfully show a likelihood of success on the merits and the parties' accounts of the events at issue are so drastically different. It is not clear from the proof provided by Jae that consumers would be served by the issuance of an injunction.

### Conclusion and Order

After analyzing and balancing the four required factors, this Court finds that the "extraordinary remedy" of a preliminary injunction is not warranted in this matter.

**IT IS ORDERED.**

For the reasons enumerated above, Plaintiff's Motion for a Preliminary Injunction, (Docket No. 5), is **DENIED**.

**A telephonic status/scheduling conference is set on February 2, 2016 at 9:30 am Central time. The Court will place the call.**

The Court shall discuss with the parties the Plaintiff's request that the Defendants' provide it with an accounting of the Defendants' sales and inventory of all Eagle Flight products that they have in stock during the telephonic conference.

cc: Counsel